[Cite as *State v. Ivery*, 2026-Ohio-2542.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115737 |
| v. | : | |
| GEORGE IVERY, JR., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 2, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-697017-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Mary Ann Zaky, Andrew Szczepanik, and Daniel T. Van, Assistant Prosecuting Attorneys, *for appellee.*

Joseph V. Pagano, *for appellant.*

DEENA R. CALABRESE, J.:

{¶ 1} On September 23, 2025, following a bench trial, the trial court found defendant-appellant George Ivery, Jr., guilty of one count of making terroristic threat, a felony of the third degree in violation of R.C. 2909.23(A)(1)(a), and two

counts of inducing panic, misdemeanors of the first degree in violation of R.C. 2917.31(A)(2) and 2917.31(A)(3). The trial court sentenced appellant to two years of community-control sanctions under the supervision of the adult probation department's community-based correctional facility unit. Appellant timely appealed, challenging the trial court's evidentiary rulings and its guilty verdict on the single count of making terroristic threat. Finding no merit to the appeal, we affirm.

## I.  Procedural Background

{¶ 2} On November 20, 2024, the Cuyahoga County Grand Jury returned a three-count indictment charging appellant with making terroristic threat, a felony of the third degree in violation of R.C. 2909.23(A)(1)(a), and two counts of inducing panic in violation of R.C. 2917.31(A)(2) and 2917.31(A)(3). The charges stemmed from appellant's posts to his Instagram account (specifically his Instagram stories), the public's reactions thereto, and appellant's continuing Instagram dialog, as it were, with the public at large. As detailed below, appellant posted multiple videos of himself wearing a black mask or balaclava while displaying, brandishing, and even shooting a 9 mm semiautomatic handgun outdoors, with several videos taken on downtown sidewalks, transit stops, and both in and around Cleveland's Tower City complex.

{¶ 3} Following discovery and pretrial conferences, the case came on for trial beginning July 9, 2025. Prior to the commencement of trial, appellant waived his right to trial by jury on the record. The signed waiver was docketed that morning.

The case proceeded to trial before the bench the same day. After opening statements, the trial court took testimony from eight witnesses and admitted 12 exhibits into evidence.

## II. Summary of Trial Testimony and Exhibits

### A. The State's Case-in-Chief

#### 1. Kelsey Johnson

{¶ 4} The State's first witness was Lakewood patrol officer Kelsey Johnson. Officer Johnson described the process of receiving calls from dispatchers. She testified that on November 9, 2024, shortly after 2:00 p.m., a dispatcher transferred a 911 caller to her. The caller, an anonymous woman, "called in stating that she runs a Cleveland Remembrance page, and that one of her followers had messaged her saying that she saw a male posting on a live Instagram story saying that he was pointing a gun at cars driving by, and she believed that it might have been in Lakewood." (Tr. 28.)

{¶ 5} The female gave Officer Johnson the Instagram name of the individual in question. She was able to locate the account. According to Officer Johnson's testimony, "it was to the public, so it wasn't private[,] so [she] was able to view the videos." (Tr. 29.) Asked to clarify what she meant by "public," Officer Johnson testified that "[a]nybody can view it. It's not private, so you can click on it, and anybody can see it that has Instagram." (Tr. 29.) She stated that the videos she observed were Instagram stories, which she characterized as "like a live feed." (Tr. 31.)

{¶ 6} Officer Johnson stated that in viewing the Instagram page, she observed a male with an extended magazine "sticking out of his hoodie pocket." (Tr. 30.) In another post, he was on a bridge "pointing the gun with the extended magazine at cars driving by." (Tr. 30.)

{¶ 7} In an effort to preserve the recordings, Officer Johnson recorded the videos using her work phone and saved them as evidence. (Tr. 31.) She testified that she identified the account holder as appellant after contacting Cleveland police, who had also received calls. She also stated that in viewing the Instagram stories, she was able to see the face of the person posting them. Officer Johnson, in open court, identified appellant as that individual.

{¶ 8} On redirect, Officer Johnson clarified that she knew the name to search for on Instagram because the female caller provided his Instagram handle. She "was able to search it in a search, and then it came up." (Tr. 39.) She confirmed she was able to access the account just as any member of the public could. (Tr. 39-40.)

### 2. Joshua Greear

{¶ 9} The State's next witness was Lakewood Detective Joshua Greear. After providing a short narrative of his employment and experience, Detective Greear described the city's 911 dispatch system. He indicated that calls were automatically recorded and were stored on the information technology department servers. (Tr. 45-46.) They could be downloaded later for investigatory purposes, in response to public records requests, or to share with prosecutors or other police agencies. He testified they are stored on the system in the ordinary course of business.

{¶ 10} Detective Greear testified that to his knowledge only one call came into Lakewood dispatch on November 9, 2024. The State identified the recording as State's exhibit No. 1. Appellant promptly objected on hearsay and Confrontation Clause grounds. The State responded that the "911 calls are generally admissible" because they "have been found to be non-testimonial[]" and the person calling "is giving information to what they believe is an ongoing emergency." (Tr. 50.) The trial court overruled the objection, and the State played the 911 call in its entirety. Detective Greear testified that it was a fair and accurate copy of the actual 911 call. (Tr. 51.)

### 3. Ray Lopez

{¶ 11} The State's third witness, Raymond Lopez, identified himself as a bartender employed by Jack Casino, connected to Tower City in downtown Cleveland. Lopez also testified that he lived in an apartment in Terminal Tower, allowing him to walk to work.

{¶ 12} Lopez had the day off on November 9, 2024, but he was in the Terminal Tower. He went down to a convenience store in the complex but "ran into a friend . . . who is a police officer, and he was frantic and he pulled me over to the side" because "he knew [Lopez] lived there." (Tr. 54.) Lopez testified:

> He showed me this live stream video with this gentleman that was terrorizing Cleveland, and he told me to be careful and that I should go up to my apartment, because he's currently there, so that's exactly what I did.

(Tr. 54-55.)

{¶ 13} Lopez testified that the video showed an individual pointing and shooting guns at cars on the highway, as well as "on the escalator in Tower City, terrorizing families with his gun; with the extended clip." (Tr. 55.)

{¶ 14} Lopez went to his apartment but realized he had forgotten the items from the convenience store. He went back downstairs, but then "noticed the individual walking in the hallway[.]" (Tr. 55.) According to Lopez, the individual was in the Terminal Tower lobby, "right where the Public Square entrance is." (Tr. 56.) He was able to identify the individual "because he [was] wearing the same exact outfit" as "in the video." (Tr. 56.) Lopez contacted the police in person and also called 911 after seeing the individual a second time. The State played the 911 call, identified as State's exhibit No. 7, without objection.

{¶ 15} Lopez testified that the incident left him extremely upset. He lost sleep, dreamt of the incident, and lost his appetite. He called off work after determining that the individual in the video had not yet been caught. (Tr. 56.)

{¶ 16} On cross-examination, Lopez testified that he definitely remembered footage of the individual "shooting at some random space[,]" i.e., "live fire[,]" but he conceded that he could not recall whether the individual had actually shot at cars "or if he was just pointing" a firearm. (Tr. 62.) He also conceded that when he saw the individual in person he did not personally observe a firearm and did not observe anyone reacting to a firearm. (Tr. 68.)

{¶ 17} On redirect, Lopez testified that he perceived the conduct as "a threat." (Tr. 71.) Specifically, "[h]im running around with a gun, streaming himself on the

internet and being downtown." (Tr. 71.) He clarified that he had observed three videos. (Tr. 71.)

### 4. Joel Ortiz

{¶ 18} Joel Ortiz testified that he was employed by Rock Security, "a privately owned security company owned by Dan Gilbert." (Tr. 74.) Ortiz stated that his duties included monitoring surveillance cameras. (Tr. 75.) The cameras, he stated, are located throughout the Tower City complex, and provide real-time, continuous, 24/7 surveillance monitored from a small office within Tower City. (Tr. 76.)

{¶ 19} On November 9, 2024, Ortiz's office received a call from Cleveland dispatch reporting a male inside Tower City "possibly with a weapon, so [they] were tasked to investigate, to look through the footage to see if anything was seen on our cameras." (Tr. 78.) Ortiz continued:

> We were able to locate the individual, and we were given the name of George Ivery, along with his social media page. We were told he may have had a weapon on him while he was in our building, so we began to review the video footage at that time. It was after the individual had left our building that we actually discovered that he was actually in our building.

(Tr. 78.)

{¶ 20} According to Ortiz, Cleveland police had described the videos and given his office the associated Instagram handle. "[A]t that time," Ortiz testified, "his Instagram account was open, so [they] were able to see any video that he had posted at that time on that day." (Tr. 78-79.) Based on a general time frame provided by Cleveland police, they were able to locate footage of the individual on the street level of Tower City. (Tr. 80.)

{¶ 21} The security office then continued to "monitor the system live to see if he would return, but [they] did not see him until the next day." (Tr. 80.) Ortiz testified that they took these steps because "any time there's a risk for safety for our pedestrians, our patrons, our employees, you know, we take that very seriously and we have to make sure our building is safe and secure at all times." (Tr. 80.) Beyond monitoring the surveillance cameras in real time, they also notified their third-party security department, Allied Universal Security, dispatched them to the building, and "[made] them aware that this is the report that we received" and "to be on basically high alert[.]" (Tr. 80-81.)

{¶ 22} The following day, at the beginning of his shift, Ortiz checked the Instagram page for any further videos. He noted a bike that the individual appeared to be using to travel between locations. Later that afternoon, he spotted the individual on surveillance camera, in real time, "exiting Tower City through our north entrance, because [he] noticed the bike that was from the videos as well." (Tr. 82.) Ortiz also "saw the extended magazine sticking out of his jacket at that point." (Tr. 82.) Having spotted the individual, another security officer "made multiple calls to different law enforcement personnel," and the security office continued to track him to the extent possible using exterior cameras. (Tr. 83.)

{¶ 23} Ortiz identified State's exhibit No. 9 as a fair and accurate copy of the surveillance footage captured by the security system and provided to police. (Tr. 87.)

{¶ 24} On cross-examination, appellant asked Ortiz to observe the individuals in Tower City who passed by appellant during the several minutes he remained in the building during mid-afternoon on November 9, 2024. Ortiz conceded that it did not appear that anyone ran from appellant or otherwise seemed fearful. (Tr. 89-90.) He further conceded that the security office did not shut down Tower City, issue a shelter-in-place order, or order a building evacuation. (Tr. 90-91.)

{¶ 25} On redirect, Ortiz testified that they did not shut down the building because the individual had not been "actually observed live in our building." (Tr. 94.) He explained:

> By the time we received the call from dispatch, the individual . . . had already left our property. We had not received any other information that he was back on our property and we did not observe him on our property as well during the 9th.

(Tr. 94.)

### 5. Donald Zubal

{¶ 26} The State's next witness was Cleveland police officer Donald Zubal. Officer Zubal testified that he had served as a patrol officer in the downtown area for several years. (Tr. 96.) Asked to describe the third district's downtown services unit, Officer Zubal testified that the department

> created the downtown services unit to focus on quality of life issues in the downtown area with the businesses and the citizens that live down there, and because of the crime and the concentration of the businesses and the citizens that live down there, they wanted a specific unit that could handle it mostly with veteran officers.

(Tr. 98.)

{¶ 27} On November 9, 2024, Officer Zubal was working a shift from 2:00 p.m. to 4:00 a.m. (Tr. 99.) That day, he and his partner responded to a call to Tower City "for a male threatening with a gun and brandishing a gun." (Tr. 100.) He was informed "that there [were] multiple calls coming in for this incident." (Tr. 100.) Tower City security sent photos of the individual. Officer Zubal "notified the other officers that were on scene touring, and [they] communicated to try to locate the suspect on scene while also conferring with Tower City security to get a better location and description of the suspect." (Tr. 101.)

{¶ 28} Officer Zubal and his partner responded directly to Tower City, pulling up in front of it at approximately 3:00 p.m. (Tr. 101.) They did not locate the individual at that time, but additional calls came in and were reported to him both by police radio and calls from Tower City. (Tr. 102.) As a result, Zubal and his partner "were there multiple times." (Tr. 102.) They "contacted Tower City security, personnel from the Third District, [their] bosses, conferred with [members] of the NICE [Neighborhood Impact and Community Engagement] unit and disseminated all the information [they] could." (Tr. 102.) Officer Zubal reported that while speaking with "multiple people" in Tower City the next day, they appeared "anxious and surprised." (Tr. 103.)

{¶ 29} On November 10, 2024, Officer Zubal further assisted in locating appellant, working not only with Tower City security but also the NICE unit and some officers from the Greater Cleveland Regional Transit Authority. (Tr. 103-104.)

{¶ 30} On cross-examination, Officer Zubal admitted that he did not prepare any written reports in connection with the incident. He also conceded that police did not evacuate the downtown area, set up roadblocks, shut down public transit, or call in a SWAT team.

### 6. Daniel Moore

{¶ 31} Daniel Moore testified that he was employed by Cleveland's Division of Police Bureau of Communications, i.e., the 911 call center for the city of Cleveland. He had been employed there for close to 14 years, and his duties included retrieving public records in response to requests, including retrieving 911 call recordings "for the prosecutor, police, [or] public record requests." (Tr. 109.) He testified that he was familiar with the way calls came into the 911 call center and the way they were recorded and stored, and he described the 911 call process, which happens in real time.

{¶ 32} Moore testified that "about seven or eight calls, total[,]" came in regarding the incident in question. (Tr. 113.) Those calls were retrieved and sent to the prosecutor's office in the usual manner.

{¶ 33} At this point the State indicated it would play some of the calls and ask Moore if he recognized them. Appellant objected on hearsay grounds. The State repeated its argument that the 911 recordings had been authenticated as business records and that 911 calls "are generally admissible in court." (Tr. 115.) The State continued:

> These calls, like I said earlier when they're coming in, people are, in fact, watching this as it's happening. These Instagram posts are

happening in real — they're not calling days later to report what they saw in Instagram. They're watching their lives. They're watching these stories and they are calling.

So it is, to them, it's just as if they're witnessing it in person. They're calling in because to them, again, that is an ongoing process.

(Tr. 115.) The trial court overruled the objection. The State played several calls, and Moore authenticated State's exhibit No. 2, exhibit No. 4, and exhibit No. 5. Appellant again objected to State's exhibit Nos. 4 and 5, noting that they appeared to consist of an individual "calling because someone told her niece about what her granddaughter saw on Instagram." (Tr. 120.) The trial court overruled the objection, but stated:

The objection is overruled but certainly the Court will give the appropriate weight to State's Exhibit No. 4. . . . Exhibit No. 4 was basically the way the Court heard it, the caller was basically relaying information third hand to the Cleveland Police dispatch with no actual personal knowledge[.]

(Tr. 121-122.)

{¶ 34} Moore went on to authenticate State's exhibit No. 6 and exhibit No. 8. He testified that all of the 911 calls, which bore electronic date and time stamps, were fair and accurate copies of the calls he assisted in retrieving for the case. (Tr. 124.)

### 7. Thomas Barnes

{¶ 35} The State's next witness, Thomas Barnes, testified that he was employed by the Cuyahoga County Sheriff's Department as a deputy sheriff assigned to the Cleveland Gun Intelligence Center. In that capacity, he "test fire[s] crime guns from Cuyahoga County." (Tr. 131.) In short, when a gun comes in, he inspects it, makes sure it is operable, and test fires it. After that, two spent shell casings are sent

to the United States Department of Alcohol Tobacco and Firearms to "put in their system for comparison for other crimes." (Tr. 131-132.)

{¶ 36} Deputy Barnes identified State's exhibit No. 10 as his unit's report related to this case. He explained that such a report would be prepared regardless of whether an inspected and tested firearm was operable. (Tr. 134.) Deputy Barnes testified that he test fired the firearm, identified as a Derya Arms model DY9 9 mm, bearing serial number TG970-24L26546, on November 15, 2024. (Tr. 135.) He testified that it was "functioning normally." (Tr. 135.)

{¶ 37} Deputy Barnes also identified State's exhibit No. 25 as the operable firearm submitted and tested. He testified that the make, model, and serial number matched the test-fire report. (Tr. 137-138.)

{¶ 38} On cross-examination, Deputy Barnes was interrogated regarding chain of custody. He conceded that he had not retrieved the firearm from an evidence locker himself and that there was no line item in the chain of custody list for whoever delivered it to his office. (Tr. 139.)

### 8. David Hardy

{¶ 39} The State's final witness was Detective David Hardy of the Cleveland Police Department. After discussing his background, he testified that he was assigned to the "regular detective bureau," which essentially investigates any type of felony apart from a sex offense or homicide, as well as some misdemeanors. (Tr. 146.)

{¶ 40} Detective Hardy testified that whether he works a case by himself or as part of a team depends on the case itself. "For this case," he testified, "it was a team of us." (Tr. 147.) The decision to work alone or as a team might be driven, for example, by whether an alleged offender had been arrested or was still at large. (Tr. 148.)

{¶ 41} Detective Hardy received appellant's case on November 10, 2024. He testified that in reviewing call notes to determine what had warranted a police presence, "there were multiple calls for a male with a gun threatening on Instagram." (Tr. 149.) He determined that appellant's Instagram account was public, allowing him to pull up the account, obtain a photo of appellant himself, and compare it to his Ohio driver's license photo, which he obtained electronically. (Tr. 149.)

{¶ 42} Next, Detective Hardy testified that he went through appellant's Instagram account and ultimately worked to obtain an arrest warrant. He identified by name three specific Third District detectives who assisted him on November 10, 2024, and further testified that "there were other detectives and other officers looking into the case." (Tr. 151.)

{¶ 43} Testimony then took a step back (temporally) to November 9, 2024. Asked to describe what actions Cleveland police had taken, Detective Hardy testified:

> Since we received the threats, and seen the videos and the firearm that Mr. Ivery had we were concerned that someone was going to be harmed, so I know on the 9th, November 9th, the Second District and multiple zone cars tried to locate Mr. Ivery on their side. The Third District had multiple officers in our Downtown Services Unit trying to

search the area for him on our side. And I think we had a couple specialized units as well searching both areas to see if we could locate him.

(Tr. 151.)

{¶ 44} With respect to the Instagram posts, Detective Hardy testified that he sent a preservation request to Meta in anticipation of a search warrant. He received and reviewed the Instagram information after Meta responded to the warrant. (Tr. 152.)

{¶ 45} Detective Hardy testified that appellant was arrested on November 10, 2024, in the area of Prospect Avenue and East 6th or 8th Street. Police "had multiple zone cars again looking for him." (Tr. 153.) Officer Zubal had spotted him getting off public transit and heading downtown. Detective Hardy and a Detective Barnett drove to the area and arrested appellant:

> We were able to get out and identify ourselves and we arrested him. He had a blue coat on, a ski mask, a firearm in his waistband with an extended magazine, and we advised him he's under arrest. And again, that was our encounter on the 10th.

(Tr. 153.) Detective Hardy testified that the firearm seen on appellant's Instagram was the same found on him when he was arrested based upon its distinct colors, glow-in-the-dark sights, and the extended magazine. (Tr. 154.) It was likewise the same firearm identified as State's exhibit No. 25.

{¶ 46} Testimony then shifted to State's exhibit No. 11, a Microsoft PowerPoint presentation containing video and still images on the left side, purportedly from appellant's Instagram account, and certain data from Meta (the company that owns Instagram) on the right. Appellant objected that the Meta data

had not been authenticated by a Meta records custodian.[1]  The trial court overruled the objection.  It first noted that there was already testimony that appellant's Instagram account had been public at the time of the incident and that Detective Hardy testified he had viewed it himself shortly after the incident.  The trial court next asked the State to clarify that Detective Hardy planned to testify that the Instagram content being presented in court was solely what he had himself viewed in appellant's Instagram feed.  (Tr. 160.)

{¶ 47} Appellant renewed his objection, noting again that while the left side of each slide contained Instagram content, the right side consisted of Meta information that Detective Hardy would not have had access to and which had not been authenticated.  (Tr. 161-162.)  The trial court acknowledged the distinction, indicating that the Meta data on the right-hand side of each slide would not affect its analysis:

> I don't disagree, [counsel].  I mean, I will say, though, what I'm looking at from Meta, it tells me nothing.  It's a timestamp, a story I.D., it says linked media file, and there appears to be some sort of code of some sort.  It doesn't provide any information that I think quite honestly proves or disproves any element of any charge in this case.

---

[1] The parties repeatedly referred to the information on the right-hand side of each PowerPoint slide as "Meta data," meaning data received from the company Meta Platforms, Inc., which owns Instagram.  This should not be confused with the more commonly used term "metadata," which Merriam-Webster's online dictionary defines as "data that provides information about other data." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/metadata (accessed June 26, 2026) [https://perma.cc/78KL-PZVZ].  In this case, by sheer coincidence, the terms could be used interchangeably for the information on the right-hand side of each PowerPoint slide.  As discussed more fully below, however, the trial court declined to consider any of the Meta data appearing on the PowerPoint slides.

(Tr. 162.)

{¶ 48} After further argument, the State began to walk Detective Hardy through the PowerPoint presentation. When it asked him to specify the date, time, and location of the very first video, appellant objected, stating that the information was "coming from the Meta data." (Tr. 169.) The trial court sustained the objection. (Tr. 169.)

{¶ 49} Detective Hardy stated that the second slide depicted appellant in downtown Cleveland. (Tr. 170.) Asked to recount what appellant said in the video, Detective Hardy responded: "On my mom I'm going to shoot this bitch up." (Tr. 171.) Slide 3 was a screenshot pertaining to a police call for service, likewise posted to appellant's Instagram with a notation stating, "They were riding past me yesterday. I was fucking them up." (Tr. 171.)

{¶ 50} Slide 4 contained video footage of the confiscated gun being pointed "on a highway overpass." (Tr. 172.) Detective Hardy stated that the area was "Cleveland State pointing down to like the 90 Interstate." (Tr. 172.) He confirmed that he reviewed this post on appellant's Instagram. (Tr. 172.) In the video, appellant sweeps the firearm from left to right over traffic that is likewise moving left to right, appearing to follow occupied cars with his handgun.

{¶ 51} Detective Hardy identified slide 5 as a post he reviewed in which appellant was wearing a facemask and black gloves. The caption read: "Lakewood do not play." In the video, appellant was "[b]asically saying after he fired his weapon

in Lakewood there was multiple cars in the area and they took it serious as they should." (Tr. 173.)

{¶ 52} Slide 6 featured a screenshot of an Instagram message from someone who asked, in response to the video depicting appellant pointing the gun at cars, if appellant was shooting at random cars. It also featured appellant's response, in the form of a caption. The caption read, "No." (Tr. 173.) Detective Hardy confirmed he had previously reviewed slide 6. (Tr. 173.)

{¶ 53} Slide 7 consisted of a video at either a Rapid stop or bus station. In the video, appellant notes that people are sharing his posts: "Somebody shared the fuck out of me, bro." He also remarks, "Get your ass burnt, messing with mine." (Tr. 174.) He brandishes a firearm in the video. Again Detective Hardy confirmed he had personally reviewed the video. (Tr. 174.)

{¶ 54} Testimony next turned to slide 8, in which appellant stated he had been pointing his gun but was not doing anything stupid. (Tr. 176.) Slide 9 was a screenshot rather than a video, depicting the reaction of an individual who observed the story showing appellant pointing his firearm at passing cars. The person responding had stated: "Why are you doing that?? We are people with families and kids & all that's sad af." Appellant then inserted a caption that reads, "IM NOT DOING ANYTHINGGGG WTF." Detective Hardy confirmed that both the video in slide 8 and the screenshot in slide 9 had been posted to appellant's Instagram account. (Tr. 174 and 176.)

{¶ 55} Slide 10 is a screenshot depicting accounts who had viewed appellant's Instagram story. In an associated caption, appellant was "basically saying even the Cleveland Remembrance Page is reviewing his story." (Tr. 177.) The caption reads: "Y'all sent the Cleveland remembrance page me yall tweaking." Detective Hardy described the Cleveland Remembrance Page:

> It's a social media page that, you know, keeps people up-to-date for shootings, police activity all around, basically all around Cleveland and surrounding suburbs. It's on Instagram. It's got thousands of followers. A lot of people get their news from Cleveland Remembrance Page.

(Tr. 177.) This was again a slide that was posted on appellant's Instagram story that Detective Hardy had viewed. (Tr. 177.)

{¶ 56} Slide 11 was yet another screenshot, this one of message requests sent to appellant. Detective Hardy reviewed the screenshot on appellant's Instagram. (Tr. 178.) The screenshot depicts four message requests. Three have the text truncated, but they begin with (in order): "It's sad your willing to . . ."; "What exactly are you . . ."; and "Why are you doing th . . . ." The screenshot contains a caption rhetorically asking what appellant did wrong since so many others "post they guns all day."

{¶ 57} Slide 12 consists of a still photo of the interior of Tower City from the second floor, with Christmas decorations and an escalator in view. The post is captioned: "I'm finna show y'all what I did wrong bet y'all trying me." Detective Hardy confirmed he viewed the post on appellant's Instagram story and gave his interpretation of the caption: "He's saying that you're saying he did something

wrong, he's going to basically show you he's going to do something wrong." (Tr. 179.)

{¶ 58} Slide 13, another screenshot, is captioned "I HIT A BAND WTFFFF." Detective Hardy explained that this meant the number of people who had viewed his videos, and that "band" stood for 1,000. (Tr. 179.) Again, Detective Hardy confirmed that this was on appellant's Instagram story. (Tr. 179.)

{¶ 59} Next, slide 14, identified by Detective Hardy as a post from appellant's Instagram story, depicted a reaction to his videos. One woman wrote: "We scared of you baby. That's why we here. Where do you be at so I know to stay away." Appellant responded by saying "I'm scaring all the pretty ladies ommg."

{¶ 60} Slide 15, identified as a post Detective Hardy reviewed on appellant's Instagram story, indicates that his video of himself following cars with his handgun had reached 1,483 views.

{¶ 61} Slide 16 consisted of a video depicting appellant actually firing his handgun with a caption that reads, "He was creeping up my bad." Detective Hardy had reviewed the video on appellant's Instagram account. (Tr. 181.) Slide 17, a video that Detective Hardy likewise viewed on appellant's Instagram story, depicted appellant wearing a facemask and ski goggles. Slide 18 consists of a video in which appellant appears to imply that it will be difficult to find him. Detective Hardy testified that he viewed it on appellant's Instagram story. (Tr. 182.)

{¶ 62} Slide 19, a screenshot viewed by Detective Hardy on appellant's Instagram story, provided an update on the number of views reached by the video

in which he sweeps his firearm left-to-right across a highway, pointing it at passing cars. It indicates the video had been viewed 3,057 times.

{¶ 63} Detective Hardy could not discern exactly what appellant was saying in the video contained in slide 20, other than that appellant mentioned he had a gun for protection. Again Detective Hardy confirmed it was a post from appellant's Instagram story. (Tr. 184.) The State skipped slide 21. Slide 22 featured a video from appellant's Instagram story stating he could not believe he was "receiving all this bullshit. Basically saying he's getting all these responses for doing what he's doing." (Tr. 185.) In slide 23, appellant appears on video wearing a facemask and asks, "Why you getting the Remembrance Page on me?" Detective Hardy stated that based on a street sign, he appeared to be in Cleveland's Ohio City neighborhood. (Tr. 186.) Detective Hardy identified this as a post he viewed on appellant's Instagram story.

{¶ 64} Slide 24, another screenshot viewed by Detective Hardy on appellant's Instagram story, provided an update on the number of views reached by the video in which he sweeps his firearm left-to-right across a highway. It indicates the video had been viewed 4,740 times. The same screenshot likewise shows that multiple other videos comprising the story had been viewed more than 4,000 times. Detective Hardy testified that he viewed this screenshot on appellant's Instagram story. (Tr. 186-187.)

{¶ 65} Detective Hardy identified slide 25 as an Instagram story he viewed on appellant's account. Appellant posted a screenshot of a text message from "Dad."

The text calls appellant "motherfucking crazy," warns appellant that police will kill him because he is "armed and dangerous," and urges appellant to "get [his] life together." Slides 26 and 27 contained Instagram posts depicting appellant in downtown Cleveland with the extended magazine and firearm visible. In slide 27, the video depicts him pointing the firearm towards Cleveland's skyline.

{¶ 66} Detective Hardy testified that all 27 slides depicted posts or stories that he had viewed from appellant's Instagram and were fair and accurate copies of the items received from Meta. (Tr. 189-190.) He further testified that he was involved in appellant's arrest and identified appellant in open court. (Tr. 189.)

{¶ 67} On cross-examination, Detective Hardy admitted that items posted to a story — as opposed to a live video — could have been created at another time. (Tr. 199.) He further conceded that the only video depicting appellant actually shooting the firearm was in an area surrounded by trees, in a location that Detective Hardy could not pinpoint. (Tr. 199-200.) He admitted that none of the posts depicted a gunshot fired in an urban setting, and that at various points in the videos appellant remarked that he was being misinterpreted and that he was not going to do anything. (Tr. 202-205.) Detective Hardy also conceded that neither Tower City nor downtown Cleveland were shut down or evacuated and that surveillance footage of appellant in Tower City did not reflect any patrons running or otherwise behaving abnormally. (Tr. 205-208.)

{¶ 68} On redirect, Detective Hardy testified that based upon his experience, he took appellant's Instagram posts seriously, including appellant saying he was

"going to shoot this bitch up on my mama" while in possession of a firearm. (Tr. 212.) He explained that he interpreted "on my mama" as "I promise on my mother[,]" i.e., not a baseless threat. (Tr. 212.) In one public video he shot the firearm. (Tr. 213.) While it was an area with trees in the background, it could not be determined whether it was in downtown Cleveland or not. (Tr. 213-214.) In addition, Detective Hardy testified that in several slides individuals reacting to appellant's posts indicated they were scared or concerned. (Tr. 213.)

{¶ 69} While acknowledging he was not an Instagram expert, Detective Hardy testified that he was familiar with the platform's operation, particularly the fact that content posted to a "story" remains visible for 24 hours after posting. (Tr. 215.) In other words, Detective Hardy could view posts from November 9, 2024, on November 10, 2024. (Tr. 215.) He further confirmed that the gun was operable based on the fact that appellant was seen firing it on video, that it was loaded, and that it was test-fired after appellant's arrest. (Tr. 216.)

{¶ 70} Finally, Detective Hardy testified that as a result of appellant's activity Cleveland police "took a lot of cars out of service to search for" appellant, something that would not be common if an incident was considered nonthreatening (Tr. 217-218.) Asked if he was aware whether anyone changed their behavior as a result of appellant's activity, he first noted the testimony of witness Ray Lopez, who "said he was scared" and "went the other way and . . . called police." (Tr. 218.) He further pointed to the 911 calls expressing concern over appellant walking around with a

firearm and making threats. (Tr. 218.) Detective Hardy testified that the slides likewise included examples of individuals expressing concern.

**B. Admission of Exhibits, Appellant's Crim.R. 29 Motions, Verdict, and Sentencing**

{¶ 71} The State rested pending the admission of exhibits. Appellant objected to State's exhibit No. 11 (the PowerPoint slideshow) and further noted that appellant continued to object to the 911 recordings. Appellant also objected to admission of the firearm testing report and the firearm itself, principally on chain-of-custody grounds. The trial court admitted all of the State's proffered exhibits over appellant's objection.

{¶ 72} Appellant then moved for acquittal pursuant to Crim.R. 29 of Count 1, making terroristic threat, a felony of the third degree in violation of R.C. 2909.23(A)(1)(a). Appellant conceded that for Crim.R. 29 purposes the State had satisfied the evidentiary threshold for misdemeanor inducing panic. (Tr. 234.) Indeed, appellant's principal argument was that the crime of making terroristic threat was "not just a big inducing panic," but also required coercion or intimidation. (Tr. 232-233.)

{¶ 73} In response, the State asked the trial court to focus on the "intimidate" component of the offense of making terroristic threat. The State argued that appellant acknowledged the fearful reactions of the public and that he mocked or taunted the public by saying he "was not going to do anything, and in the same breath . . . y'all try me." (Tr. 237.) The State pointed out that appellant knew police were looking for him because he posted a screenshot of a police scanner message

but nevertheless continued to post in order to intimidate and scare people. (Tr. 237-238.) It noted that live witness Ray Lopez sounded "frantic" during his 911 call and "believed something was going to happen." (Tr. 239.)

{¶ 74} The trial court denied appellant's Crim.R. 29 motion in its entirety.

{¶ 75} Appellant called no witnesses and rested pending the admission of a hypertext markup language file, produced by Meta, for preservation in the record. The trial court promptly admitted the exhibit as court's exhibit No. 11A. (Tr. 248-252.) Appellant requested some clarification with respect to State's exhibit No. 11, specifically how the trial court intended to consider the left side of each slide (actual Instagram content, such as video footage) versus the data on the right side of each slide. The trial court reiterated:

> I'm going to tell you whatever was appearing on the right side of the screen is in no way impacting my view of this case or how I will ultimately rule with respect to whether or not the State has met its burden. There was nothing substantiative in those Meta documents.
>
> I mean, quite honestly, I'm not entirely sure why the State introduced them in that fashion when you had a detective who viewed everything. You could have just shown the detective the Instagram stories and live videos and posts because his testimony was that he saw all of them.

(Tr. 255.)

{¶ 76} Appellant renewed his Crim.R. 29 motion, again focusing on the issue of coercion or intimidation with respect to Count 1, making terroristic threat. The trial court denied the motion, and the parties presented closing arguments, with appellant conceding Count 2, inducing panic in violation of R.C. 2917.31(A)(2). The trial court took the matter under advisement.

{¶ 77} The trial court announced its verdict on September 23, 2025. It found appellant guilty on all counts and proceeded directly to sentencing. The trial court sentenced appellant to two years of community-control sanctions under the supervision of the adult probation department's community-based correctional facility unit.

{¶ 78} This timely appeal followed.

## III. Assignments of Error

{¶ 79} Appellant presents four assignments of error for our review:

Assignment of Error I: The trial court erred by admitting 911 calls over defense objection in violation of the Rules of Evidence and Appellant's constitutional rights. (U.S. Const. VI Amend.)

Assignment of Error II: The trial court erred by admitting the PowerPoint presentation (State's Ex. 11) created by the State combining information from other discovery which was not properly authenticated.

Assignment of Error III: The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the conviction for terroristic threats.

Assignment of Error IV: The conviction for terroristic threats was against the manifest weight of the evidence.

{¶ 80} Finding no merit to any of Appellant's assignments of error, we affirm the trial court's verdicts.

## IV. Analysis

### A. The 911 Calls — Confrontation Clause and Hearsay Challenges

{¶ 81} In his first assignment of error, appellant argues that the trial court erred by admitting 911 calls over defense objection in violation of the Confrontation Clause and the evidentiary rules prohibiting the introduction of hearsay. We find no merit to these arguments.

### 1. Confrontation Clause

{¶ 82} We review a trial court's evidentiary rulings that implicate the Confrontation Clause de novo. *State v. Lucas*, 2024-Ohio-842, ¶ 18 (8th Dist.). "'De novo review requires an independent review of the trial court's decision without any deference to the trial court's determination.'" *State v. Knox*, 2016-Ohio-5519, ¶ 12 (8th Dist.), quoting *State v. Clay*, 2016-Ohio-424, ¶ 5 (2d Dist.).

{¶ 83} "The Sixth Amendment's Confrontation Clause, which is binding on the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Lucas* at ¶ 19. "[T]he 'admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.'" *Id.* at ¶ 20 (8th Dist.), quoting *State v. Maxwell*, 2014-Ohio-1019, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a

criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990); *Lucas* at ¶ 20; *State v. Smith*, 2019-Ohio-3257, ¶ 10 (1st Dist.).

{¶ 84} "Because 'only testimonial hearsay implicates the Confrontation Clause,' the admission of nontestimonial statements does not violate the Sixth Amendment." *Lucas* at ¶ 21, quoting *State v. McKelton*, 2016-Ohio-5735, ¶ 185. "Whether statements are testimonial or nontestimonial depends on the primary purpose of the statements." *Lucas* at ¶ 22, citing *McKelton* at ¶ 185. Statements are nontestimonial where circumstances objectively indicate "'that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Lucas* at ¶ 22, quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006). If instead there is no ongoing emergency "and 'the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution,' then the statements are testimonial." *Lucas* at ¶ 22, quoting *Davis* at 822. "A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." *Davis* at 827; *Lucas* at ¶ 22.

{¶ 85} "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Michigan v. Bryant*, 562 U.S. 344, 345 (2011). In *Bryant*, the Court explained that "[a]n assessment of whether an emergency threatening the police and public is ongoing cannot narrowly focus on whether the threat to the first victim has been neutralized because the threat to the first responders and public

may continue." *Id.* In addition, "an emergency's duration and scope may depend in part on the type of weapon involved[.]" *Id.* In *Lucas*, this court elaborated on the latter point, remarking that the type of weapon involved is relevant, "with an assailant with a gun posing a greater risk to the police and the public, *even if the assailant is no longer on the scene.*" (Emphasis added.) *Lucas* at ¶ 24.

{¶ 86} In addition, while the existence of an ongoing emergency is significant to the primary purpose analysis, "'any conclusion determining that there is no ongoing emergency is not dispositive of the Confrontation Clause question.'" *Lucas* at ¶ 25, quoting *State v. Williams*, 2024-Ohio-337, ¶ 26 (8th Dist.), citing *Cleveland v. Merritt*, 2016-Ohio-4693, ¶ 22 (8th Dist.). "Instead, 'whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015), quoting *Bryant* at 366; *Lucas* at ¶ 25 (8th Dist.).

{¶ 87} The *Lucas* Court reiterated:

> This court has recognized that statements made during a 911 call are often found to be nontestimonial and are admissible if the statements satisfy a hearsay exception. This is because a 911 caller is typically speaking about events as they are actually happening and although one might call 911 to provide a narrative report of a crime absent any imminent danger, 911 callers are usually facing ongoing emergencies. Under such circumstances, the 911 caller is not testifying, the 911 caller is not acting as a witness, and the statements of the 911 caller are not testimonial in nature.

(Cleaned up.) *Lucas* at ¶ 29.

{¶ 88} Reviewing the 911 calls in their entirety, we find the various callers' statements to dispatchers were made during an ongoing emergency and were

nontestimonial in nature. The callers were informing dispatchers of an ongoing emergency and sought immediate police intervention. Viewing the calls under the totality of the circumstances, they objectively indicate that the statements "were not made 'to document past events' but were made with the 'primary purpose' of obtaining . . . assistance in resolving an ongoing threat of gun violence." *Lucas* at ¶ 30. Similar to *Lucas*, appellant "remained armed" and "posed an ongoing threat." *Id.* Indeed, the calls were made while an armed individual had not been located, had allegedly posted contemporaneous videos to an Instagram account displaying and pointing a firearm in public areas, and was believed to be in or near Tower City or elsewhere in downtown Cleveland. Considered objectively, the primary purpose of the calls was to alert police and obtain assistance for a perceived ongoing threat to public safety, not to "document past events." The 911 calls were nontestimonial. Accordingly, the trial court did not violate appellant's rights under the Confrontation Clause.

### 2. Hearsay

{¶ 89} Having concluded that the 911 calls were nontestimonial, we must next consider whether they were admissible despite appellant's hearsay objections. "[E]ven if an out-of-court statement is nontestimonial, for evidence of that statement to be properly admitted at trial, it must also be admissible under the rules of evidence, including the rules against the admission of hearsay." *Lucas* at ¶ 38. "A trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay." *In re*

*A.M.*, 2022-Ohio-612, ¶ 22 (8th Dist.), citing *Solon v. Woods*, 2014-Ohio-5425, ¶ 10 (8th Dist.). "We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion." *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239 (1984).

{¶ 90} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible unless it falls within an exception under the rules of evidence. *Lucas*, 2024-Ohio-842, at ¶ 38 (8th Dist.), citing Evid.R. 802, 803, and 804.

{¶ 91} "'911 calls are generally admissible as excited utterances or under the present sense impression exception to the hearsay rule.'" *Cleveland v. Myles*, 2022-Ohio-4504, ¶ 25 (8th Dist.), quoting *State v. Martin*, 2016-Ohio-225, ¶ 59 (5th Dist.). Evid.R. 803(1) defines present sense impression as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." "Regarding Evid.R. 803(1), '[t]he key to the statement's trustworthiness is the spontaneity of the statement; it must be either contemporaneous with the event or be made immediately thereafter.'" *Myles* at ¶ 25, quoting *State v. Essa*, 2011-Ohio-2513, ¶ 126 (8th Dist.). "'The principle underlying this hearsay exception is the assumption that statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of trustworthiness.'" *State v. Dixon*, 2003-Ohio-2550, ¶ 12 (3d Dist.),

quoting *Cox v. Oliver Machinery Co.*, 41 Ohio App.3d 28, 35 (12th Dist. 1987). "Accordingly, 'Ohio courts have routinely held that 911 calls are admissible as present sense impressions.'" *Myles* at ¶ 26, quoting *Ohio v. Scott*, 2021-Ohio-3427, ¶ 17 (1st Dist.).

{¶ 92} Another exception to the hearsay rule "is an excited utterance, which Evid.R. 803(2) defines as '[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'" *Lucas* at ¶ 38. As this court explained:

> For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) there must be a startling event that produces a nervous excitement in the declarant, (2) the statement must have been made while the declarant was still under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the startling event.

*Id.* at ¶ 39.

{¶ 93} While the passage of time between the event and the declaration is relevant, "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance." *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993). The startling event and the utterance need not be contemporaneous. *Lucas* at ¶ 40, citing *State v. Duncan*, 53 Ohio St.2d 215 (1978), paragraph one of the syllabus. "[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation." *Duncan* at 219-220. *See also Taylor* at 303; *Lucas* at ¶ 40. "[T]he

relevant inquiry is whether the declarant is still under the stress of the event or whether the statement was the result of reflective thought." *Id.*

{¶ 94} Our review of the 911 calls and the complete record reveals that many of the callers were viewing appellant's Instagram postings in essentially real time, calling 911 in stressful tones to report a perceived active threat. We are unconvinced by appellant's argument that the declarants did not "personally observe" the startling events because they were mediated by technology, i.e., because they were viewed on Instagram. In our view, the requirement of personal observation does not contain the additional requirement that an event be viewed "in person," and appellant has cited no cases suggesting as much. We fail to see how 911 calls based on nearly contemporaneous Instagram videos are materially different than a security guard calling 911 to report what was seen on a surveillance camera or, to step outside social media, an observer aided by binoculars or a telescope. *In re P.T.*, 2013-Ohio-3881 (12th Dist.), involved a juvenile who was adjudicated delinquent for inducing panic by publishing Facebook posts regarding a school shooting. While the Twelfth District's decision did not involve a hearsay analysis, the court affirmed the delinquency adjudication, noting that "P.T.'s Facebook posts caused members of the public to contact police[.]" *Id.* at ¶ 35. *See also State v. Parker*, 2007-Ohio-1512, ¶ 54 (2d Dist.) (appellate court had "no difficulty finding that [witness] was competent to testify to what she observed on the surveillance monitor").

{¶ 95} Assuming without deciding that some portions of the 911 recordings contained inadmissible hearsay, reversal is not warranted. As in *Cleveland v. Myles*,

2022-Ohio-4504 (8th Dist.), "this case was tried to the bench." *Id*. at ¶ 16. "'When the trial court is the trier of fact, the judge is presumed capable of disregarding improper hearsay evidence, and unless it is demonstrated that the court relied on inadmissible hearsay, a conviction will not be reversed.'" *Id*., quoting *State v. Crawford*, 2013-Ohio-1659, ¶ 61 (8th Dist.). The record contains nothing demonstrating that the trial court relied on inadmissible hearsay. In fact, while the trial court accepted State's exhibit No. 4 into evidence over appellant's hearsay objection, it stated that "the caller was basically relaying information third hand to the Cleveland Police dispatch with no actual personal knowledge" and accordingly it would "give the appropriate weight" to the exhibit. (Tr. 121-122.)

{¶ 96} Even though the trial court remarked on the 911 calls in handing down its verdict, the transcript suggests it relied on the *fact* that the 911 calls were made, and the effect of those 911 calls, rather than any hearsay descriptions of appellant's *conduct*. The record does not indicate that the trial court found that appellant pointed a gun at traffic based on a 911 caller's account. Appellant filmed himself pointing a gun at traffic and uploaded it to Instagram, and that video was admitted into evidence. The record does not suggest that the trial court relied on inadmissible hearsay to find that appellant made threats. Again, appellant filmed himself making threats. Instead, the trial court's references to 911 calls more generally supported its findings that members of the community saw the Instagram posts, reacted by calling 911, and that the posts caused fear.

{¶ 97} Indeed, the 911 recordings were not the only evidence, or even the principal evidence, of appellant's actual conduct. Independent of the 911 recordings, the State presented testimony and exhibits showing that appellant's public Instagram account depicted him with a distinctive firearm and extended magazine in public areas, pointing the firearm toward passing vehicles, shooting the firearm, making threatening statements, reacting to public concern about his posts, and loitering in Tower City. Even after setting aside any portions of the 911 recordings that appellant characterizes as hearsay, the remaining evidence, including the live testimony of 911 caller Lopez and the authenticated Instagram posts, overwhelmingly established both the conduct underlying the convictions and the public response to it. "[E]ven without the alleged hearsay testimony, the trial court could have concluded that" appellant committed the offenses. *State v. Williams*, 2025-Ohio-1457, ¶ 33 (8th Dist.). Accordingly, "any error in admission would be harmless" and "we need not determine the impropriety of the alleged hearsay statement[s]." *Id. See also State v. Hutchinson*, 2025-Ohio-4674, ¶ 32 (8th Dist.) (Statements in second forensic interview "were cumulative to other evidence" and any error in admission was harmless in a bench trial because "judges are presumed to know the law and consider only material, admissible evidence.").

{¶ 98} Appellant's first assignment of error is overruled.

**B. The PowerPoint Presentation**

{¶ 99} In his second assignment of error, appellant argues that the trial court erred by admitting State's exhibit No. 11, the PowerPoint presentation. Appellant

contends that the PowerPoint was created by the State and "combined information from Instagram posts with other discovery materials, without proper authentication as required by Ohio Evid.R. 901." (Appellant's brief at p. 11.) We find no merit to this argument.

{¶ 100} The decision to admit or exclude evidence rests within the trial court's sound discretion and will not be reversed absent an abuse of discretion. *State v. Teague*, 2009-Ohio-129, ¶ 5 (8th Dist.), citing *State v. McGuire*, 80 Ohio St.3d 390, 400-401 (1997). A trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Hunter v. Troutman*, 2025-Ohio-366, ¶ 64 (8th Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Hunter* at ¶ 64, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).

{¶ 101} Appellant's challenge to the State's exhibit No. 11 is centered on authenticity. Appellant correctly notes that the PowerPoint slides consisted of "screenshots and videos allegedly from Appellant's Instagram account, along with Meta data and other information." (Appellant's brief at p. 12.) We address those distinct components separately, just as the trial court did.

{¶ 102} In *State v. Young*, 2022-Ohio-3132, ¶ 63 (8th Dist.), the defendant challenged the admission of photographs posted to Facebook of Young and others "brandishing firearms, riding in vehicles that fit the descriptions of the ones they were accused of stealing, and holding themselves out to be a gang." *Id.* at ¶ 63.

Young challenged the authenticity of the Facebook photos, noting that a detective had merely testified that they were received in response to a search warrant. *Id.* at ¶ 64.

{¶ 103} In overruling Young's associated assignment of error, this court first noted that pursuant to Evid.R. 901(A), the "'requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* at ¶ 66, quoting Evid.R. 901(A). This authentication standard "is liberal and may be satisfied by either circumstantial or direct evidence sufficient for the trier of fact to conclude that the evidence is what its proponent claims it to be." *State v. Garcia-Toro*, 2019-Ohio-5336, ¶ 30 (8th Dist.).

{¶ 104} In *Young*, this court observed that "Ohio courts have also held that the determination of admissibility and authentication of social media evidence is 'based on whether there was sufficient evidence of authenticity for a reasonable jury to conclude that the evidence was authentic.'" *Young* at ¶ 66, quoting *State v. Gibson*, 2015-Ohio-1679, ¶ 41 (6th Dist.). The bar is set rather low:

> "The hurdle the proponent of the document must overcome in order to properly authenticate a document is not great. . . . Thus, the purpose behind authentication is to connect the particular piece of evidence sought to be introduced to the facts in the case by giving some indication the evidence is relevant and reliable. The ultimate decision on the weight to be given to that piece of evidence is left to the trier of fact."

*Young* at ¶ 66, quoting *State v. Brown*, 2002-Ohio-5207, ¶ 33-35 (7th Dist.).

{¶ 105} Furthermore, *Young* was not the first time this court had considered social media evidence:

> In *State v. Inkton*, 2016-Ohio-693, 60 N.E.3d 616, ¶ 72 (8th Dist.), the court admitted appellant's Facebook page into evidence, holding that "[t]here has been testimony sufficient to support, if believed, that it is what it purports to be." In *Inkton*, a detective and a codefendant testified that "there were 'numerous' pictures on appellant's Facebook page and that [they] were able to determine that appellant was in fact that person in the pictures," thus properly authenticating them. *Id.* at ¶ 78.

*Young* at ¶ 67.

{¶ 106} As discussed above, the detective in *Young* had monitored a Facebook account that he determined belonged to Young and followed up by obtaining records from Facebook pursuant to a warrant. He then testified to the authenticity of the records. This court held that "[t]here was no evidence that the Facebook page was created by anyone other than appellant, nor was there evidence that the page was fabricated or tampered with." *Id.* at ¶ 69. Accordingly, the evidence "satisfie[d] the relatively low burden of authentication." *See also Garcia-Toro*, 2019-Ohio-5336, at ¶ 30 (8th Dist.) (Facebook evidence was properly authenticated where detective testified he received it pursuant to search warrant and personally reviewed the documents); *State v. Padgette*, 2020-Ohio-672, ¶ 10-16 (8th Dist.) (Facebook evidence properly authenticated where detective and another witness testified to authenticity of photo from Facebook page and no testimony suggested photo was fabricated or tampered with.).

{¶ 107} The same is true in the present case, i.e., the State satisfied the relatively low burden of authentication through the testimony of Detective Hardy. Detective Hardy testified that he quickly learned of appellant's Instagram username and was immediately able to review appellant's public Instagram story, using the Instagram application itself, on November 10, 2024. He further testified that he received a compendium of photos and videos from Meta, the company that owns Instagram, pursuant to a search warrant. (Tr. 152.) Detective Hardy testified that the photos and videos received in response to the warrant matched what he viewed on Instagram and that the person consistently depicted in the videos was in fact appellant.

{¶ 108} Furthermore, in light of the cases above, including *Young*, Detective Hardy could authenticate the entire compendium of videos and screenshots received in response to the warrant, even if parts of a certain story had expired or had been marked as private. He testified that he received those items in response to the warrant and that it was appellant depicted in the content based not only on appellant's face but also his clothing and the distinctive firearm recovered from appellant the day of his arrest. As already noted, the "authentication standard is liberal and may be satisfied by either circumstantial or direct evidence sufficient for the trier of fact to conclude that the evidence is what its proponent claims it to be." *Garcia-Toro*, 2019-Ohio-5336, at ¶ 30 (8th Dist.); *see also Inkton*, 2016-Ohio-693, at ¶ 73 (8th Dist.).

{¶ 109} Finally, as in the cases discussed above, there was no evidence that the videos and screenshots had been fabricated or tampered with in any fashion. That point is particularly important here because it bears on appellant's argument that the PowerPoint "was created by the prosecutor's office, not by Detective Hardy." (Appellant's brief at p. 12.) Detective Hardy's testimony supplied a sufficient Evid.R. 901 foundation for admission of the Instagram content on the left-hand side of each slide, which is best viewed as digital duplicates of the content received from Instagram in response to the search warrant.

{¶ 110} Evid.R. 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." In *State v. Taylor*, 2012-Ohio-5421 (8th Dist.), this court upheld the admission of "videos and still-frame photographs taken from . . . surveillance video" that "were duplicates of the original recording." *Id*. at ¶ 26. "'The decision to admit duplicates, in lieu of originals, is one that is left to the sound discretion of the trial court.'" *Id*. at ¶ 27, quoting *State v. Easter*, 75 Ohio App.3d 22, 27 (4th Dist. 1991). Moreover, "the party seeking to exclude a duplicate has the burden of demonstrating that the duplicate should be excluded." *Taylor* at ¶ 27, citing *State v. Tibbetts*, 92 Ohio St.3d 146, 160 (2001).

{¶ 111} Focusing at this point only on the Instagram content on the left-hand side of the slides, appellant "did not raise genuine questions as to their trustworthiness." *Taylor* at ¶ 39. Accordingly, the trial court did not abuse its

discretion in admitting the Instagram content, i.e., the videos and screenshots. Detective Hardy authenticated that content in accordance with Evid.R. 901, and the content displayed in the PowerPoint consisted of admissible duplicates of content that Detective Hardy testified he had actually reviewed.

{¶ 112} Many of appellant's remaining arguments under this assignment of error are directed to the Meta data appearing on the right-hand side of each slide. Appellant acknowledges the trial court's statements (at tr. 162 and 255) that it would assign no weight to this information. He nevertheless complains that "[y]et, the Court admitted Exhibit 11, which included this information." (Appellant's brief at p. 12-13.)

{¶ 113} The State, citing the transcript pages referenced directly above, counters that the trial court expressly announced that it would not consider the Meta information on the right-hand side of each slide. It argues that "the trial court indicated twice, on the record, that it gave the Meta data no weight." (State's brief at p. 17.) To some extent, we disagree. In our view, the trial court essentially indicated three times, not just twice, that it would give no weight to the Meta information. In addition to the cited excerpts at tr. 162 and 255, the trial court sustained appellant's objection when the State attempted to elicit testimony from Detective Hardy that appeared to be derived from the Meta information on the right-hand side of the slides:

> Q. . . [Detective] Hardy, could you please give us the date and time and location based on this post?

[APPELLANT'S COUNSEL]: Objection.  That's coming from the Meta data.  He has no access to that . . . .

THE COURT: Objection sustained.

(Tr. 169.)  The State asked no further questions that prompted Detective Hardy to reference the Meta data on the right-hand side of each slide.

{¶ 114} With respect to appellant's complaint that the trial court admitted the PowerPoint presentation in its entirety despite its statements that it would not consider the Meta data, we have already noted, in connection with appellant's first assignment of error, that "judges are presumed to know the law and consider only material, admissible evidence."  *Hutchinson*, 2025-Ohio-4674, at ¶ 32 (8th Dist.). Here, the trial court prohibited Detective Hardy from testifying as to the Meta data on the slides and expressly indicated it found that data to be immaterial.  In the context of a bench trial, we see no need for the trial court to go further by, for example, requiring the State to scrub the information that it had deemed immaterial.  Accordingly, the admission of the entire exhibit was not erroneous.

{¶ 115} Appellant's second assignment of error is overruled.

**C. Sufficiency of the Evidence**

{¶ 116} In his third assignment of error, appellant argues there was insufficient evidence to support his conviction for making terroristic threat and that the trial court therefore erred in denying his Crim.R. 29 motions for acquittal.[2]

---

[2] Appellant does not challenge his misdemeanor convictions.

{¶ 117} This court has recently reaffirmed that "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Spencer*, 2024-Ohio-5809, ¶ 15 (8th Dist.), citing *State v. Murphy*, 91 Ohio St.3d 516, 516 (2001); *Williams*, 2025-Ohio-2593, at ¶ 26 (8th Dist.); *State v. Lynch*, 2025-Ohio-2769, ¶ 49 (8th Dist.). The appellate court views the evidence "'in a light most favorable to the prosecution'" to determine whether "'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Spencer* at ¶ 15, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *Williams* at ¶ 26. The inquiry is whether the State has met its "burden of production" at trial. *State v. Dyer*, 2007-Ohio-1704, ¶ 24 (8th Dist.); *Lynch* at ¶ 49.

{¶ 118} "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Cleveland v. Williams*, 2024-Ohio-3102, ¶ 10 (8th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *see also Cleveland v. Neal*, 2024-Ohio-1467, ¶ 26 (8th Dist.); *Lynch* at ¶ 49. Appellate courts are not to assess "whether the State's evidence *is to be believed*, but whether, *if believed*, the evidence against a defendant would support a conviction." (Emphasis added.) *Dyer* at ¶ 24; *Lynch* at ¶ 49. In considering the sufficiency of the evidence, we do not independently weigh the evidence. *Cleveland v. Wiggins*, 2025-Ohio-649, ¶ 37 (8th Dist.).

{¶ 119} Appellant argues that the State failed to present sufficient evidence that appellant made terroristic threats "with the purpose to intimidate or coerce a civilian population as required by R.C. 2909.23." (Appellant's brief at p. 14.) R.C. 2909.23 provides:

> (A) No person shall threaten to commit or threaten to cause to be committed a specified offense when both of the following apply:
>
> > (1) The person makes the threat with purpose to do any of the following:
> >
> > > (a) Intimidate or coerce a civilian population;
> > >
> > > (b) Influence the policy of any government by intimidation or coercion;
> > >
> > > (c) Affect the conduct of any government by the threat or by the specified offense.
> >
> > (2) As a result of the threat, the person causes a reasonable expectation or fear of the imminent commission of the specified offense.
>
> (B) It is not a defense to a charge of a violation of this section that the defendant did not have the intent or capability to commit the threatened specified offense or that the threat was not made to a person who was a subject of the threatened specified offense.
>
> (C) Whoever violates this section is guilty of making a terroristic threat, a felony of the third degree. Section 2909.25 of the Revised Code applies regarding an offender who is convicted of or pleads guilty to a violation of this section.

{¶ 120} "Specified offense" is defined, in pertinent part, as a felony offense of violence.[3] While the statute does not define "threat,"

---

[3] The indictment listed the specified offense as felonious assault in violation of R.C. 2903.11.

[g]enerally speaking . . . the term "threat" in the criminal context connotes "[a] communicated intent to inflict harm or loss on another. . . [.]" Black's Law Dictionary 1519 (8th Ed.2004). The term "terroristic threat" is understood to mean "[a] threat to commit any crime of violence with the purpose of . . . terrorizing another[.]" *Id.* When interpreting a different criminal statute, the Supreme Court defined "threat" as "'an expression of an intention to inflict evil, injury, or damage on another usu[ally] as retribution or punishment for something done or left undone.' It connotes almost any expression of intent to do an act of harm against another person irrespective of whether that act is criminal." *State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, ¶ 36, 858 N.E.2d 341, quoting Webster's Third New International Dictionary 2382 (1986), citing *State v. Moyer*, 87 W.Va. 137, 104 S.E. 407 (1920).

*State v. Klingel*, 2017-Ohio-1183, ¶ 7 (9th Dist.). Moreover, R.C. 2909.23(B) makes actual intent or capability of carrying out the threat irrelevant and further provides that the threat need not be made to "a subject of the threatened specified offense."

{¶ 121} Appellant's argument is essentially confined to challenging whether the State produced sufficient evidence that appellant acted "with purpose" to either "[i]ntimidate or coerce a civilian population." We do not find appellant's arguments convincing.

{¶ 122} Elements of an offense may be proven by direct or circumstantial evidence, which have equal evidentiary value. *Id.* at ¶ 46, citing *State v. Wells*, 2021-Ohio-2585, ¶ 25-26 (8th Dist.). To be more precise, "'[p]roof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *Lynch*, 2025-Ohio-2769, at ¶ 50 (8th Dist.), quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.), citing *State v. Nicely*, 39 Ohio St.3d 147, 151 (1988); *Jenks* at 272.

{¶ 123} "A person acts 'purposely' 'when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature . . . it is the offender's specific intention to engage in conduct of that nature.' R.C. 2901.22(A)." *State v. Dickerson*, 2023-Ohio-4787, ¶ 43 (8th Dist.). "Because direct evidence of a defendant's intent 'will seldom be available,' such 'proof often must be derived from circumstantial evidence,' i.e., gathered from all the surrounding facts and circumstances." *Dickerson* at ¶ 46, quoting *State v. Cammon*, 2018-Ohio-3183, ¶ 19 (8th Dist.). *See also State v. Johnson*, 56 Ohio St.2d 35, 38 (1978) ("'The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court.'"), quoting *State v. Huffman*, 131 Ohio St. 27 (1936), paragraph four of the syllabus; *In re E.W.*, 2025-Ohio-1461, ¶ 28 (8th Dist.). "Indeed, a defendant may be convicted based solely on circumstantial evidence." *Dickerson* at ¶ 46.

{¶ 124} Viewing the evidence in a light most favorable to the prosecution, as we must for purposes of a sufficiency analysis, we find that appellant's conduct and the surrounding circumstances support the conclusion that he acted with the purpose of intimidating a civilian population. Appellant posted Instagram story videos of himself walking downtown, masked, carrying a firearm with an extended magazine hanging out of his open jacket. In one video in a downtown location, he

stated "on my mama I'm about to shoot this bitch up." He continued to post such videos of himself in public places, including downtown sidewalks, mass-transit stops, and inside Tower City.

{¶ 125} Importantly, appellant's purpose can be inferred from the decision to make his Instagram story public and his continuing to post disturbing content after he became aware of the public's alarm. The public nature of the posts was evidenced not only by Detective Hardy's testimony, but also by appellant's own screenshots showing his apparent delight in both the written expressions of public alarm generated by his posts and the increasing number of views he was amassing. State's exhibit No. 11 reflects that appellant picked one particular post — the video of him pointing his handgun at occupied cars on the highway — to demonstrate the increasing popularity of his public story. In slide 15, he posted a screenshot showing that the video had been viewed 1,483 times. In slide 19, he posted a screenshot indicating it had been viewed 3,057 times. The screenshot on slide 24 reflects that by then, the video had been viewed 4,740 times.

{¶ 126} Witness Lopez described this particular video as one of appellant's most distressing posts, provoking intense fear and even causing him to imagine himself and his family in the position of one of the moving cars at which appellant had pointed his gun. Appellant's posts intimidated Lopez to the point that he called off work.

{¶ 127} The video also plainly caused distress to individuals viewing it on Instagram. One Instagram user responded to the video by asking, "You shooting at

random cars?" Another responded specifically to that video by asking, "Why are you doing that?? We are people with families and kids & all that's sad af." While appellant publicly answered "No" to the first inquiry and essentially said he "wasn't doing anything" in response to the second, he did not stop posting objectively distressing content. Instead, he escalated by posting a picture from inside Tower City captioned: "I'm finna show y'all what I did wrong bet y'all trying me." Detective Hardy testified that he interpreted the caption as "saying that you're saying he did something wrong, he's going to basically show you he's going to do something wrong." (Tr. 179.) Appellant then mocked another commenter who stated she was scared and wanted to stay away from his location, captioning the screenshot: "I'm scaring all the pretty ladies ommg."

{¶ 128} Even after all that, appellant still did not put away his phone. After openly acknowledging that members of the public were expressing fear over his conduct, particularly the video in which he followed moving cars with his firearm, he opted to provide visual and audible proof that it was no toy: Appellant posted a video of himself firing five shots outdoors, in broad daylight, while wearing a mask over his face. He also taunted viewers with statements that essentially conveyed the message, "They can't find me." All of this permits an inference that appellant acted with a purpose to intimidate the civilian population, i.e., the population that viewed his posts thousands of times, expressed fear in messages to him, and even called 911. *See State v. Baughman*, 2012-Ohio-5327, ¶ 27 (6th Dist.) (Where defendant's letters contained threats to "society in general" and referred to himself as a serial killer and

mass killer, "a rational trier of fact could have concluded that [defendant's] threats were made in order to intimidate or coerce a civilian population[.]"); *State v. Laber*, 2013-Ohio-2681, ¶ 3 (4th Dist.) (Where defendant "conveyed threats to a fellow employee against his employer while at his place of employment . . . [t]hese facts are sufficient for the trier of fact to conclude that appellant meant to intimidate the population at the workplace."). *See also State v. Steiner*, 2022-Ohio-2088, ¶ 17 (9th Dist.) (Whether the defendant "intended to commit the specified offense is inapposite" under R.C. 2909.23.).

{¶ 129} Appellant's citation to *Godwin v. Facebook, Inc.*, 2020-Ohio-4834 (8th Dist.), is unhelpful to his argument. *Godwin* involved a civil complaint against Facebook concerning an allegedly threatening post that preceded a murder. Specifically, one of Godwin's five causes of action against Facebook was for "civil recovery for a criminal act in failing to report a terrorist threat." *Id*. at ¶ 4. This court found that the trial court properly dismissed that statutory claim because Godwin did not allege "that any particular civilian in the Cleveland area even saw the post before the murder occurred," that anyone reasonably believed the poster "would imminently commit murder," or that the statutory elements were otherwise satisfied. *Id*. at ¶ 36. This court wrote that "[a]n isolated comment 'to do some murder shit,' *without context*, is insufficient to satisfy the well-pleaded complaint rule." (Emphasis added.) *Id*. at ¶ 35.

{¶ 130} Unlike *Godwin*, this case does not involve an isolated comment devoid of context. The State introduced evidence that appellant had a public

Instagram account with a public story and that members of the public actually viewed appellant's posts, including many showing appellant with a firearm in downtown locations, showing appellant pointing the weapon at occupied vehicles, and at one point even discharging the firearm outdoors. The State likewise put on evidence that the public reacted with alarm to the posts, including reactions on Instagram and by contacting police via 911. Furthermore, the State put on evidence that appellant continued to post threatening content even after he was made aware that the public was alarmed.

{¶ 131} As noted above, we do not independently weigh the evidence in our sufficiency analysis. *Hill*, 75 Ohio St.3d at 205. There was sufficient evidence to convict appellant of the charge of making terroristic threat. The State's evidence, if believed, supported findings as to all elements of the offense, including the elements that appellant specifically challenges, namely, that he acted with the purpose of intimidating or coercing a civilian population. The State met its burden of production, and a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. *Dyer*, 2007-Ohio-1704, at ¶ 24 (8th Dist.); *Spencer*, 2024-Ohio-5809, at ¶ 15 (8th Dist.).

{¶ 132} Appellant's third assignment of error is overruled.

**D. Manifest Weight of the Evidence**

{¶ 133} In his fourth assignment of error, appellant argues that his conviction for making terroristic threat was against the manifest weight of the evidence. "In contrast to a sufficiency argument, a manifest weight challenge

questions whether the state met its burden of persuasion." *State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.). "In our manifest weight review of a bench trial verdict, we recognize that the trial court serves as the factfinder, and not the jury." *Cleveland v. McCoy*, 2023-Ohio-3792, ¶ 26 (8th Dist.), citing *State v. Travis*, 2022-Ohio-1233, ¶ 28 (8th Dist.); *see also Cleveland v. Hale*, 2024-Ohio-2712, ¶ 4 (8th Dist.) (analyzing manifest weight issue in context of bench trial); *Cleveland v. Clark*, 2024-Ohio-4491, ¶ 45 (8th Dist.) (same); *State v. Kennedy*, 2024-Ohio-1586, ¶ 65 (8th Dist.) (same). Accordingly, this court has previously written:

> "[T]o warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered."

*Kennedy* at ¶ 65, quoting *State v. Strickland*, 2009-Ohio-3906, ¶ 25 (8th Dist.). An appellate court will reverse on manifest weight "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins*, 78 Ohio St.3d at 387 (1997). This is because "in a manifest-weight review, the weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact." *State v. Metz*, 2019-Ohio-4054, ¶ 70 (8th Dist.); *see also Cleveland v. Johns*, 2024-Ohio-3301, ¶ 24 (8th Dist.). Indeed, an appellate court "'may not substitute its own judgment for that of the finder of fact.'" *Id.*, quoting *State v. Harris*, 2021-Ohio-856, ¶ 33 (8th Dist.).

{¶ 134} Here, the State introduced substantial evidence to establish, beyond a reasonable doubt, every element of the charged offense. Appellant relies largely on an argument that there was a "lack of any serious response to [his] alleged threats," including the decision not to evacuate Tower City. There are at least two flaws in this argument. First, causing an evacuation or lockdown is not an element of the offense. In a related vein, in a case involving a conviction for inducing panic, this court noted that "[t]he absence of an evacuation does not negate a finding of serious public inconvenience or alarm[.]" *Cleveland v. Petrovich*, 2015-Ohio-599, ¶ 26 (8th Dist.), citing *In re J.C.*, 2013-Ohio-1292, ¶ 19 (11th Dist.). Second, the decision not to evacuate does not indicate the lack of a "serious response" to appellant's threats. Here, the State offered substantial evidence that police devoted considerable resources to locating and arresting appellant as quickly as possible, all triggered by multiple expressions of public alarm over his activities. The public's reaction, coupled with the heightened police activity and literal manhunt for appellant, puts to rest his argument that "no one regarded [his] posts or videos as actual threats." (Appellant's brief at p. 19.)

{¶ 135} We have independently reviewed the entire record, including the testimony of every witness and each exhibit admitted into evidence. This included not only the testimony of law enforcement but of fact witness Ray Lopez, who testified that he considered appellant's activity to be not only threatening but so frightening and disturbing that he took time off work. It also included appellant's Instagram story videos threatening the public, his screenshots demonstrating the

public's alarmed reactions thereto, and appellant's subsequent escalation and taunting of the public in response to those reactions. It included the 911 calls made in the interest of public safety, with the proviso that in a case tried to the bench the trial court could sift inadmissible hearsay from admissible evidence. On this record, we cannot conclude that this is the exceptional case where the trial court clearly lost its way and created a manifest miscarriage of justice in returning a guilty verdict on the charge of making terroristic threat.

{¶ 136} Appellant's fourth assignment of error is overruled.

{¶ 137} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

MARY J. BOYLE, P.J., and
SEAN C. GALLAGHER, J., CONCUR